712 S.E.2d 779

**Janet HORNBECK, Intervenor Below, Appellant**

v.

**John E. CAPLINGER and Bureau for Child Support Enforcement, Respondents Below, Appellees.**

**No. 35678.**

Supreme Court of Appeals of West Virginia.

Submitted April 27, 2011.

Decided June 14, 2011.

Robert S. Fluharty, Jr., Fluharty & Townsend, Parkersburg, WV, Counsel for the Appellant.

John E. Caplinger, Little Hocking, OH, pro se

Kimberly D. Bentley, Charleston, WV, Counsel for the Appellee, Bureau for Child Support Enforcement.

McHUGH, Justice:

This case involves a question regarding the method employed by the Bureau of Child Support Enforcement (hereinafter "BCSE") to allocate child support arrearage payments between principal and interest. It is before this Court upon the appeal of an intervenor below, Janet Hornbeck (hereinafter "Ms. Hornbeck"),[1] from the October 1, 2009, order of the Circuit Court of Wood County affirming the order of the Family Court of Wood County entered on July 30, 2009. The BCSE and John E. Caplinger (hereinafter "Mr. Caplinger"), the father ordered to pay the child support at issue, are the appellees named in this proceeding.

---

1. The appellate petition and briefs refer to both Janet and Donald Hornbeck as appellants in this proceeding. However, at the outset of oral argument it was stated by counsel for the Hornbecks that the sole appellant in this matter is Janet Hornbeck as Mr. Hornbeck is a step grandfather who lacks standing with regard to this issue.

Ms. Hornbeck maintains that the lower court erred by affirming the family court's ruling that the BCSE method of distributing child support arrearage payments between principal and interest is appropriate even though it deviates from the way these allocations are generally made for court-ordered money judgments not involving support. After due consideration of the arguments and relevant law, the Court affirms the circuit court's order for the reasons more fully set forth herein.

## I. Factual and Procedural Background

The matter before us arose during a proceeding initiated by Mr. Caplinger to obtain physical custody of his child for whom he had previously been ordered to pay child support.[2] During the course of the custody proceeding,[3] the family court also considered a contested BCSE affidavit which had been filed alleging an arrearage of child support payments. According to the July 30, 2009, family court order, the accrued amount of child support arrearage was considered at a hearing on December 3, 2008. Two calculations were presented to the court regarding the arrearage. The calculation presented by Ms. Hornbeck was roughly $4,650 more than the BCSE calculation, with the difference attributable to the way that the overdue payments were allocated between principal and interest. The BCSE calculation was based on its application of arrearage payments first to principal, whereas the Hornbeck calculation followed the typical money-judgment allocation of payments on a debt being made first to interest with the remainder applied to the principal owed.

In the July 30, 2009, order, the family court recognized the issue as one of first impression and determined that "absent statutory or case law direction, that it ... [was] compelled to adopt the accounting of the BCSE." The family court arrived at this decision after finding that "[t]he BCSE is a statutorily created agency created by Federal mandate to collect and distribute child support," and that case law reflects that this Court has tacitly approved BCSE accounting methods by relying on the calculations of the agency when deciding other child support issues.

The family court decision was appealed to the circuit court, where the ruling was affirmed by order entered October 1, 2009. Following a recitation of the statutory and case law bases relied upon by Ms. Hornbeck and the BCSE[4] in support of their arguments, the October 1, 2009, order reflects the following conclusion:

> Therefore, in the absence of any statutory guidelines or case law as to how the Family Court is to apply child support arrearage payments to past-due principal and interest and given the BCSE's apparent authority to establish a method of applying these payments and its long-standing practice of applying these payments first to a reduction of the outstanding principal balance owed and then to accrued and unpaid interest, the Court finds that the Family Court did not err as a matter of law nor abuse its discretion in its application of the procedure followed by the BCSE.

Ms. Hornbeck appealed to this Court for review of the circuit court order by petition filed on June 1, 2010.

## II. Standard of Review

 Our approach to review of circuit court orders stemming from appeals of family court judgments is established.

> In reviewing a final order entered by a circuit court judge upon a review of, or upon a refusal to review, a final order of a family court judge, we review the findings

---

2. Mr. Caplinger's daughter was born in 1995, and in 1997 the BCSE petitioned the court to obtain child support as well as reimbursement of medical, birthing and other expenses incurred by the State. When the mother of the child died in a motor vehicle accident in 2002, the BCSE took steps to redirect the child support payments to Ms. Hornbeck as the maternal grandmother who had custody of the child.

3. Mr. Caplinger now has full custody of the child; effective September 1, 2007, Mr. Caplinger's obligation to continue to pay child support was terminated due to the custodial modification.

4. Mr. Caplinger did not file a response to the appeal in circuit court.

of fact made by the family court judge under the clearly erroneous standard, and the application of law to the facts under an abuse of discretion standard. We review questions of law *de novo.*

Syllabus, *Carr v. Hancock,* 216 W.Va. 474, 607 S.E.2d 803 (2004). The precise issue raised in this appeal concerns a matter of first impression regarding the validity of an administrative procedure or rule. "Interpreting a statute or an administrative rule or regulation presents a purely legal question subject to *de novo* review." Syl. Pt. 1, *Appalachian Power Co. v. State Tax Dept. of West Virginia,* 195 W.Va. 573, 466 S.E.2d 424 (1995). Thus our consideration of the pending subject requires the application of a de novo standard.

### III. Discussion

■ The straightforward issue before us is whether the law requires that a child support arrearage be treated as a money judgment whereby excess payments received must first be applied to reduce accrued interest before any of the payment may be applied to outstanding principal.[5]

Ms. Hornbeck argues that there is no legislative authority for the procedures BCSE has established and follows in treating child support arrearage payments differently than the long-established practice applicable to other money judgments. *Hurst's Adm'r v. Hite, Adm'r,* 20 W.Va. 183, 193 (1882) (recognizing the proper rule of allocating partial payments on a debt subject to a judgment is to apply the payment first to interest). She further maintains that the BCSE method of allocating arrearage payments to make it easier for an obligor to discharge his obligation is in direct contradiction of the mission of the agency to enforce court-ordered obligations of a parent to support his or her child. Furthermore, Ms. Hornbeck maintains that BCSE procedures frustrate the underlying purpose of awarding interest on a debt: to give the obligee the present value of the debt. In support of her position, Ms. Hornbeck points to five state court decisions which arrive at the conclusion she advances.

We do not find the cases from other states helpful in our deliberations or dispositive of the issue before us. The cited state court decisions in California and Arizona have since been superseded by statutes which expressly require excess payments be applied first to principle rather than interest. Ariz. Rev.Stat. § 25–510 (2011); Cal.Code Civ. Proc. § 695.221 (2009). The decisions of the state courts in Mississippi,[6] North Dakota,[7] and Oregon,[8] appear to rely on common law principles because, unlike the case before us, there was no fixed policy or procedure of a designated child support enforcement agency in place in those states. Moreover, any issues dealing with interest in relation to child support are state matters, governed by each state's relevant laws.[9]

BCSE relates that the agency's procedure for allocating arrearage payments is not a new development and has been in use since the early 1990's.[10] The agency also main-

---

5. Mr. Caplinger filed a response brief and appeared at oral argument challenging the mathematical accuracy of the outstanding arrearage BCSE attributed to him, and whether all payments made by an employer through wage withholding were properly reconciled. Since these matters were not argued below or otherwise preserved for appeal, they will not be addressed herein. Syl. Pt. 6, in part, *Parker v. Knowlton Const. Co., Inc.,* 158 W.Va. 314, 210 S.E.2d 918 (1975) ("[T]he Supreme Court of Appeals is limited in its authority to resolve assignments of nonjurisdictional errors to a consideration of those matters passed upon by the court below and fairly arising upon the portions of the record designated for appellate review.").

6. *Fuhr v. Fuhr,* 818 So.2d 1237 (Miss.Ct.App. 2002).

7. *Martin v. Rath,* 589 N.W.2d 896 (N.D.1999).

8. *In re Marriage of Gayer,* 326 Or. 436, 952 P.2d 1030 (1998).

9. A federal Office of Child Support Enforcement memorandum explicitly notes that state law is determinative of issues regarding interest on child support in arrears. *See* OCSE–AT–98–24 (1998), and related nn. 13 and 14 *infra.*

10. BCSE noted that the practice of allocating child support arrearage payments to principal before interest stems from a legislative rule of what was previously called the Department of Human Services which incorporated by reference the Policy and Procedural Manual of the Child Advocate Office. W.Va. R. tit. 78, § 6 (1988). The Child Advocate Office had been one

tains its procedures are well within the authority the Legislature has vested in the agency to establish enforcement procedures with regard to child support. It asserts that the procedure for allocating past due child support payments was developed in recognition of the fundamental difference between child support arrearage and a debt subject to a civil money judgment. The agency supports its position by noting this Court's observation in *Supcoe v. Shearer*, 204 W.Va. 326, 330, 512 S.E.2d 583, 587 (1998), that child support payments are a legal duty rather than a debt. Additionally, BCSE maintains that the Legislature's recognition of the fundamental difference between support orders and money judgments in the enactment of remedies conforming with federal requirements for collection of child support which are significantly different from those available for collection of routine money judgments.[11] The statutes governing interest on support also stand apart from those relating to money judgments.

■■■ At issue in this proceeding is the validity of a "procedure" established and followed by an administrative agency. We have previously recognized that

> [i]t is fundamental law that the Legislature may delegate to an administrative agency the power to make rules and regulations to implement the statute under which the agency functions. In exercising that power, however, an administrative agency may not issue a regulation which is inconsistent with, or which alters or limits its statutory authority.

Syl. Pt. 3, *Rowe v. West Virginia Department of Corrections*, 170 W.Va. 230, 292 S.E.2d 650 (1982). The general powers and

duties conferred on the BCSE by the Legislature as the statutory agency designated for federal purposes to administer the state plan for child support are set forth in West Virginia Code § 48–18–105 (2003) as including: "(1) To establish policies and procedures for obtaining and enforcing support orders ... *according to this chapter*." (Emphasis added.) Thus, BCSE's support enforcement rules must be consistent with the intent of the Legislature in enacting the West Virginia Domestic Relations Act. W.Va.Code 48–1–101(a).

■■■ Although the parties never squarely represented or argued that the allocation procedure is an administrative rule or regulation, it clearly falls within the broad definition of rules subject to the Administrative Procedures Act (hereinafter "APA"). The APA provides:

> "Rule" includes every regulation, standard or statement of policy or interpretation of general application and future effect, including the amendment or repeal thereof, affecting private rights, privileges or interests, or the procedures available to the public, adopted by an agency to implement, extend, apply, interpret or make specific the law enforced or administered by it or to govern its organization or procedure, but does not include regulations relating solely to the internal management of the agency, nor regulations of which notice is customarily given to the public by markers or signs, nor mere instructions. Every rule shall be classified as "legislative rule," "interpretive rule" or "procedural rule," all as defined in this section, and shall be effective only as provided in this chapter[.]

of the entities formerly designated by the Legislature as the State agency charged with child support enforcement. *See* W.Va.Code § 48–1–208 (2001). The BCSE was designated pursuant to federal requirements as the "single and separate organizational unit within this State to administer the state plan for child and spousal support" as of July 1, 1995. W.Va.Code § 48–18–101 (2002).

11. *See e.g.* W.Va.Code § 61–5–29 (2009) (prosecution for failure to pay support); § 48–15–102 (2001) (allowing actions to cause the denial, nonrenewal, restriction, revocation or suspension of

various business, professional and driver's licenses to enforce payment of support arrearage); §§ 48–18–117 (2005), 48–18–118 (2008) (interception of federal and state income tax refunds to pay support arrearage); *also see generally* W.Va.Code Chapter 48, Article 14 (various remedies specific to enforcement of support obligations, including: liens against personal and real property; income withholding calculations; contempt proceedings; court order to post bonds or give security to guarantee payment of overdue support; method to increase payments to satisfy overdue support).

W.Va.Code § 29A–1–2(I) (1982). Thus, in order to ascertain whether the lower courts were correct in finding that the overdue child support allocation procedure is a proper exercise of the authority delegated to BCSE, we begin our analysis by first establishing the classification of the rule so as to determine the level of deference the agency's action should be afforded. *Appalachian Power Co.*, 195 W.Va. at 583, 466 S.E.2d at 434.

Unquestionably, the procedure at issue is not currently [12] a legislative rule promulgated by the agency and enacted by the Legislature. [13] The two remaining classes of rules under the APA are interpretive and procedural. These categories are defined in the APA, as follows:

> (c) "Interpretive rule" means every rule, as defined in subsection (i) of this section, adopted by an agency independently of any delegation of legislative power which is intended by the agency to provide information or guidance to the public regarding the agency's interpretations, policy or opinions upon the law enforced or administered by it and which is not intended by the agency to be determinative of any issue affecting private rights, privileges or interests. An interpretive rule may not be relied upon to impose a civil or criminal sanction nor to regulate private conduct or the exercise of private rights or privileges nor to confer any right or privilege provided by law and is not admissible in any administrative or judicial proceeding for such purpose, except where the interpretive rule established the conditions for the exercise of discretionary power as herein provided. However, an interpretive rule is admissible for the purpose of showing that the prior conduct of a person was based on good faith reliance on such rule. The admission of such rule in no way affects any legislative or judicial determination regarding the prospective effect of such rule. Where any provision of this code lawfully commits any decision or determination of fact or judgment to the sole discretion of any agency or any executive officer or employee, the conditions for the exercise of that discretion, to the extent that such conditions are not prescribed by statute or by legislative rule, may be established by an interpretive rule and such rule is admissible in any administrative or judicial proceeding to prove such conditions[.]

> \* \* \*

> (g) "Procedural rule" means every rule, as defined in subsection (i) of this section, which fixes rules of procedure, practice or evidence for dealings with or proceedings before an agency, including forms prescribed by the agency[.]

West Virginia Code § 29A–1–2.

Since the allocation procedure now before us extends beyond the APA definition of a procedural rule, we find the more appropriate classification to be an interpretive rule. We have generally examined interpretive rules in the context of an agency's interpretation of matters related to but not included in a legislative rule, [14] the same analysis would apply to any rule which falls within the definition of interpretive rule. As we have previ-

---

12. *See* n. 8, *supra*.

13. As stated in West Virginia Code § 29A–1–2(d), "Legislative rule" means every rule, as defined in subsection (i) of this section, proposed or promulgated by an agency pursuant to this chapter. Legislative rule includes every rule which, when promulgated after or pursuant to authorization of the Legislature, has (1) the force of law, or (2) supplies a basis for the imposition of civil or criminal liability, or (3) grants or denies a specific benefit. Every rule which, when effective, is determinative on any issue affecting private rights, privileges or interests is a legislative rule. Unless lawfully promulgated as an emergency rule, a legislative rule is only a proposal by the agency and has no legal force or effect until promulgated by specific authorization of the Legislature. Except where otherwise specifically provided in this code, legislative rule does not include (A) findings or determinations of fact made or reported by an agency, including any such findings and determinations as are required to be made by any agency as a condition precedent to proposal of a rule to the Legislature; (B) declaratory rulings issued by an agency pursuant to the provisions of section one, [§ 29A–4–1] article four of this chapter; (C) orders, as defined in subdivision (e) of this section; or (D) executive orders or proclamations by the Governor issued solely in the exercise of executive power, including executive orders issued in the event of a public disaster or emergency[.]

14. *See e.g. Kokochak v. West Virginia Lottery Com'n*, 225 W.Va. 614, 695 S.E.2d 185 (2010); *Apollo Civic Theatre, Inc. v. State Tax Com'r*, 223 W.Va. 79, 672 S.E.2d 215 (2008); *Cookman Real-*

ously explained, interpretive rules "do not create rights but merely clarify an existing statute or regulation ... [and thus] need not go through the legislative authorization process." *Appalachian Power Co.*, 195 W.Va. at 583, 466 S.E.2d at 434.

The level of deference afforded an agency's interpretation was also addressed in the *Appalachian Power Co. v. State Tax Department* case, wherein we stated:

Although they are entitled to some deference from the courts, interpretive rules do not have the force of law nor are they irrevocably binding on the agency or the court. They are entitled on judicial review only to the weight that their inherent persuasiveness commands.

*Id.* Although the weight of inherent persuasiveness appears to be an oblique standard, its meaning was further addressed in *Appalachian Power* by reliance on the following excerpt from the United States Supreme Court's decision in *General Electric Company v. Gilbert*, 429 U.S. 125, 141–42, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976):

" 'We consider that the rulings, interpretations and opinions of the Administrator under this Act, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.' " (internal citation omitted).

*ty Group, Inc. v. Taylor*, 211 W.Va. 407, 566 S.E.2d 294 (2002).

**15.** Although the policy manual was referenced in the deliberations before lower courts and the briefs filed in this Court, no part of the manual was contained in the record on appeal. Likewise the record did not contain a copy of a Federal Office of Child Support Enforcement memorandum to which reference was made. Given the relevance of these documents to the issue under consideration, the Court upon its own motion directed that BCSE supplement the record with these materials following oral argument. *See* Rev. W.Va. R.A.P. R.6 (b) (2010).

*Appalachian Power Co.*, 195 W.Va. at 583, 466 S.E.2d at 434. Naturally, these criterion would all need to be weighed against the backdrop of the agency acting within the limits of its legislatively delegated authority.

Pursuant to its statutory authority to establish policies and procedures for obtaining and enforcing child support payments, the BCSE has developed a "BCSE Policy Manual." [15] The manual outlines a support distribution hierarchy for support payments whereby, pursuant to federal requirement, current support is paid first; [16] money in excess of current support is next applied to principal in arrears. [17] BCSE maintains that this procedure is in keeping with the legislative intent that parents have a most serious obligation to provide for the support of the needs of their children. Applying excess payments to child support principal in arrears merely carries out this priority by providing that any available assets go toward tending to the needs of a child over and above payment of interest which would benefit someone other than the child.

Indeed, the intent of the Legislature to afford different treatment to support payments generally and overdue payments specifically, is apparent not only within the provisions of Chapter 48 but through other enactments as well. This is particularly evident with regard to remedies and imposition of interest.

As previously noted, the Legislature has fashioned various methods to foster compliance with payment of child support, through both civil and criminal means. *See* n. 9, *supra.* These remedies are unique to overdue support payments and are not available

**16.** 45 C.F.R. § 302.51 (2009). There is no federal requirement regarding interest on support payments, and the matter of interest accrual and distribution of payments to interest is completely subject to the law of each state. *See* Office of Child Support Enforcement Action Transmittal, OCSE–AT–98–24 (1998).

**17.** BCSE Policy Manual § 08000.15.15. According to BCSE representations, the hierarchy of allocation of support payments set forth in § 08000.15.15 initially went into effect on November 1, 1993, and has always required that payments in excess of current support be applied to principal in arrears before interest.

for enforcement of ordinary money judgments.

The Legislature's treatment of interest on past-due child support also deviates from its treatment of interest on other types of money judgments. At the outset, statutes governing child support did not require that interest be applied to past due amounts. Furthermore, when the Legislature elected to impose interest on overdue payments it did not enact a singular method for determining the rate of interest or payment of interest that would uniformly apply to general money judgments as well as overdue support payments. *See* W.Va.Code § 56–6–29 (1923) (allowing compounding of interest on money judgments), W.Va.Code § 48–1–302(a) (2008) [18] (expressly prohibiting compound interest on an obligation resulting from a domestic relations action); W.Va.Code § 56–6–31 (2006) (providing a method to annually calculate rates of interest applicable to general money judgments), W.Va.Code § 48–1–302(a) [19] (specifying a five percent rate of interest applicable to unpaid domestic relations obligations). In some instances, the Legislature has even given priority to payment of support-related obligations over payment of money judgments. *See e.g.* W.Va. Code §§ 46A–2–130 (1996), 48–14–206 (2001). Additionally, the Legislature has created an amnesty program whereby interest may be waived on support arrears upon certain conditions being met. W.Va.Code § 48–1–302(c).[20] No comparable enactment exists for money judgments.

■ Based upon the different manner by which these two categories of legal obligations have been addressed by various legislative enactments, it is consistent with legislative intent for child support obligations be held to different standards than typical debts resulting in money judgments. West Virginia Code § 48–18–105 extends authority to the BCSE to establish a procedure for distribution of money received as payment of child support obligations,[21] and such authority extends to how payments received in excess of a current month's obligation should be distributed. Importantly, the BCSE rule of applying excess payments to principal rather than interest reflects close adherence to the Legislature's stated purpose underlying child support payments: to "encourage and require a child's parents to meet the obligation of providing that child with adequate food, shelter, clothing, education, and health and child care." W.Va.Code § 48–11–101(a) (2001). Consequently, we hold that the rule of the Bureau of Child Support Enforcement directing that excess child support payments be applied to arrearage principal before interest is within the authority granted the agency in West Virginia Code § 48–18–105. Accordingly we affirm the circuit court's order upholding the family court's ruling of the amount of outstanding child support in this case based upon the application of the BCSE allocation rule.

### IV. Conclusion

For the reasons previously stated, we affirm the October 1, 2009, order of the Circuit Court of Wood County affirming the order of the Family Court of Wood County entered on July 30, 2009.

Affirmed.

---

18. W.Va.Code § 48–1–302 was reenacted without relevant modification during the 2011 legislative session. *See* Enr. H.B. 3134.

19. *See* n. 16, *supra.*

20. *See* n. 16, *supra.*

21. It remains unclear why BCSE has not proceeded to promulgate legislative rules pursuant to 48–18–105(19) to address the issue at hand.